ARLENA A. PUSHARD *vs.* GEORGE A. COWAN.

Cumberland.     Opinion, February 28, 1935.

*Hinckley, Hinckley & Shesong,* for plaintiff.
*Weston M. Hilton,* for defendant.

SITTING: PATTANGALL, C. J., DUNN, STURGIS, BARNES, THAXTER, HUDSON, JJ.

THAXTER, J.   This is an action for assault brought by the plaintiff against the defendant, an attorney residing in Damariscotta. After a similar action had been nonsuited in the Superior Court in Lincoln County, the plaintiff moves to Portland, and by reason of the change of her residence was able to bring the present suit in Cumberland County. After a verdict for the plaintiff

assessing damages in the sum of $5,650.32, the case is before us on the defendant's general motion for a new trial.

Except for two doctors, one who saw the plaintiff after the alleged assault took place, and another who testified as to her condition at the time of the trial, she was the only witness in her own behalf. She is not thereby left without a remedy, if her testimony bears the mark of truth. Her story is that in the evening of January 19, 1933 she left her home and walked to Mr. Cowan's house where she arrived about half past eight. It was damp and foggy, and the streets were filled with slush. Her reason for going was to talk with him about a disclosure hearing held during the afternoon, on a judgment against her mother, at the conclusion of which her stepfather had paid Mr. Cowan ten dollars. It is apparent that she was resentful about the collection of this money, which, though paid by her stepfather, she claimed belonged to her. She says that the defendant answered her knock on the door, invited her in politely, that they sat down in the living room and began their conversation in the presence of two of his small children. The following is her story of these preliminaries:

"Q. Then just what did you say to Mr. Cowan after you spoke about the children? A. We were seated and I said 'Why did Mr. —— when I was seated I said to Mr. Cowan 'May I ask you a few questions in regard to the cases over to Wiscasset today,' and he said 'Certainly.' I says 'Why did Mr. Littlejohn pay you ten dollars over to Wiscasset today?' He said 'He gave me the money.' I said 'He gave you the money? What for?' He said 'To settle a claim.' I said 'I understood that a real estate disclosure was served on my mother's property, but I didn't understand that there was any papers served on my step-father.' He replied 'No.'

Q. Then what happened? A. Then he jumped out of his chair and rushed over to the door and I supposed somebody had rapped.

Q. Everything had been perfectly pleasant up to that point? A. Everything was pleasant. I wasn't angry. I didn't know but there might have been extra charges that I didn't understand.

Q. Everything was perfectly quiet and peaceable up to that time? There had been no angry words? A. No.

Q. No voices had been raised or anything said up to that time? A. No, we were sitting there talking."

Then, as she relates, he told her with an oath to get out, and as she rose to do so he seized her by the arm and shook her violently, struck her head against the casement of the door, dragged her through the door to the porch, where he shook her again, and then before she could escape from him, kicked her violently in the back throwing her to her hands and knees. With difficulty she picked herself up and went home.

This much of her story taxes credulity to the limit. She was met courteously, the conversation was temperate, when without the slightest warning and for no apparent reason, he made a brutal attack on her in the presence of his children. If her theory of this assault is correct, she has unquestionably failed to relate some of the talk and the circumstances which led up to this sudden change of demeanor on his part.

But what happened immediately thereafter is significant. When she arrived home, her mother called Dr. Neil L. Parsons. He states that the plaintiff is a very neurotic woman, that she was in a highly nervous state, but that he found no marks on her body or physical injury of any kind. He could not account for her condition, called in a consultant, and finally diagnosed the trouble as hysteria caused by some sort of nervous excitement. Dr. Swift, who saw her shortly before the trial, states that she is suffering from hysteria and that she is apparently unable to walk.

The defendant testifies that at the time of the occurrence his wife, who had been ill for some months, was in a serious condition and under the care of a trained nurse. His story is in accord with the plaintiff's, that she came to his house about half past eight in the evening and that he invited her in. He then says that, as the conversation opened, she immediately charged him with exacting money from her feeble-minded stepfather, that she commenced to talk louder and accused him of stealing her money, that he requested her to stop, and called her attention to the fact that his wife was sick and that his children were present, that he got up,

opened the door and requested her to leave, and that she walked out of the house calling him a thief and again accusing him of stealing her money, that as she was on the threshold he put his hand on her shoulder, moved her through the door and closed it, and that after she was on the sidewalk she walked up the street shouting loudly that it was her money that he had stolen.

Such are the stories of the parties themselves. His is that of a man unexpectedly faced in his own home by the fury of a neurotic and highly excitable woman. That he was himself irritated and wrought up by the attack, and tried for the sake of his family to get her out is undoubtedly true. Certain facts in connection with her own recital stand out. Anyone who reads the record will conclude that she did not go to the defendant's house just to make a social call, but obviously, having nursed her wrath, planned to open an argument about the happenings of the afternoon. In spite of being courteously invited in by the defendant, and almost before the discussion of the matter in controversy opened, she contends that this assault took place. Such a claim is inconsistent with what are the normal reactions of men and women under such circumstances. She displayed to the jury clothes ripped and torn as she claims by the defendant. Yet her mother, who was present when she arrived home, who could have told of her condition, did not take the stand to testify. The testimony of the doctor who saw her that evening as to the absence of bruises or marks on her body is inconsistent with her claim that she was assaulted, as she relates. That her symptoms of paralysis are not inconsistent with an assault both doctors admit, but it is a far deduction from such conclusion that an assault caused the symptoms. Dr. Parsons concedes that no physical injury accounted for her trouble, and both men admit that it could have been caused by mental excitement alone. Quite possibly the reactions of an introspective and neurasthenic woman to the experiences of the afternoon resulted in the explosion, which seems to have taken place at the defendant's house in the evening. In any event her story in comparison with that of the defendant does not ring true, is refuted by established facts, and raises grave doubts in the mind of an impartial arbiter whether the incident as told by her ever took place.

But there is much more to the case than this. Mrs. Hall, the

nurse, saw what happened. She heard the plaintiff's voice raised in the sitting room in anger, and because of Mrs. Cowan's very critical condition, came to the head of the stairs to request quiet. She saw Mr. Cowan and the plaintiff as they approached the front door and states that no assault was committed of any kind. She heard the plaintiff accuse the defendant of stealing her money, and heard her loud talk and screams as she went up the street to return home. She corroborates the defendant's version in every particular.

Mrs. Cowan testifies that, as she lay very ill in bed upstairs, she heard the plaintiff in a loud voice accuse Mr. Cowan of stealing her money, that the windows of her bedroom were open, and that she heard Mrs. Pushard, after she left the house fling back this same charge in a loud and angry voice from the street.

There is a further aspect to this case much more sinister even than all this. Defendant's Exhibit 2 is in evidence. It is in the handwriting of the plaintiff. She admits that she wrote it. It purports to be a statement of some third party who was an eye-witness of this supposed assault. According to this, the narrator took the plaintiff home, after he had seen her brutally attacked. In explanation of this document, William Chickering, a relative of the plaintiff, testifies that it was written by the plaintiff in his presence and in the presence of her mother, and was a recital which they wished him to give in court as a witness for the plaintiff; and he further states that they offered him for such testimony "a hundred dollars, win or lose, and more if they won." He testifies that he was home on the night in question, and saw nothing of the occurrence. As that part of this statement which relates how Mr. Chickering took the plaintiff home contradicts the plaintiff's own testimony that she went home alone, she was forced to acknowledge the falsity of that part of it. Her explanation of why she wrote it at all is too absurd to be believed by anyone. It appears to have been a patent attempt to purchase false testimony to bolster a cause which was known to be utterly without merit.

Just why the jury should have rendered in this case the verdict which they did is not easy to explain. Their judgment was undoubtedly clouded by the apparently serious condition of the plaintiff due to a mental disturbance of some kind. To permit

322

such a verdict to stand would be to acknowledge the impotence of this Court to redress an apparent wrong.

*Motion sustained.*
*New trial granted.*